**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert G. WILSON, Melvin Bogus,**
**Defendants–Appellants.**

**No. 86–5508.**

United States Court of Appeals,
Eleventh Circuit.

June 29, 1990.

Jake Arbes, Atlanta, Ga., Leonard J. Cooperman, Miami, Fla. (court-appointed), for Robert G. Wilson.

Theodore J. Sakowitz, Federal Public Defender, Lisa A. Rosenthal, Asst. Federal Public Defender, Miami, Fla., for Melvin Bogus.

Leon B. Kellner, U.S. Atty., Miami, Fla., Robert E. Lindsay, William S. Rose, Jr., Shirley D. Peterson, Asst. Atty., Gen., Alan Hechkopf, U.S. Dept. of Justice, Tax Div., Washington, D.C., for plaintiff-appellee.

Before CLARK and EDMONDSON, Circuit Judges, and RUBIN *, Senior Circuit Judge.

ALVIN B. RUBIN, Senior Circuit Judge:

If government witnesses in a criminal case testify that they had not only had been granted immunity but that they also expected to receive rewards of up to $11,-000,000, is their testimony against the de-

fendants so tainted that the defendants were denied due process?

Robert Wilson and Melvin Bogus were convicted of tax fraud, aiding and abetting tax fraud, mail fraud, wire fraud, and conspiracy to commit mail and wire fraud. They contend that the rewards allegedly promised by the Government to witnesses who testified for the prosecution were so large as to violate due process, that their convictions for conspiracy were based on a theory of deprivation of intangible rights, in violation of *McNally v. United States* [1], and that other errors were made in their trial. Finding neither a denial of due process nor any merit in the defendants' other contentions, we affirm.

## I.

Robert Wilson and his partner purchased an offshore corporation in 1978 for the purpose of trading in government securities as a tax shelter for individual investors. The investment program was marketed by two corporations controlled by Wilson and his partner. In 1980 the defendants shifted the marketing of the program to UMS, a company of which Melvin Bogus was a director. In response to a state investigation regarding the sale of securities without a license by the companies controlled by Wilson and his partner, Bogus also took over the daily operation of the investment program.

None of these companies ever actually traded in securities. Joseph Tritt, a broker retained by Wilson and his partner, fabricated a paper trail purporting to represent actual trades, but Wilson and Bogus contend that they were unaware of this and that they believed Tritt was engaged in genuine transactions. Tritt and his then-wife, Katherine, reached a plea bargain with the Government, pursuant to which they testified at the trial that they had held discussions with Wilson and his partner regarding the elaborate measures to be taken to simulate trading losses to match the tax losses desired by investors. Tritt,

---

* Honorable Alvin B. Rubin, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

Katherine, and other employees of his company would retrospectively calculate the purchases and sales that would hypothetically have produced the trading losses required, and would then issue false confirmations of trades to Wilson's company. Tritt also testified that Bogus had suggested that unused (false) trade confirmation slips already prepared but not allocated to any client's account be retrospectively allocated to clients for an additional fee. As part of this practice, backdated promissory notes were used to mislead the IRS regarding why fees for certain trades were received after the end of a given tax year.

The Government also adduced evidence that Wilson had failed to file income tax returns in 1978 and 1979, and that Bogus had filed returns for those years claiming trading losses generated by the shelter. Bogus had also carried losses backward and forward, claiming refunds for taxes paid in 1975, 1977, and 1979.

## II.

Joseph and Katherine Tritt, the Government's key witnesses at trial, testified that, in addition to promises of immunity, they anticipated receiving substantial monetary rewards from the Government, based on the recovery of unpaid taxes by the IRS from the principals and investors in the fraudulent shelters. Bogus and Wilson argue that since the amount of the eventual reward turns on the quality of the informers' testimony, their testimony was in effect given on a "contingent fee" basis, and that this so impaired the witnesses' credibility as to deny the defendants of due process. The Government contends that the Tritts' testimony at trial will not determine whether they receive a reward, or if so, its size.

## A

The Secretary of the Treasury is authorized by statute "to pay such sums ... as he may deem necessary for detecting and bringing to trial and punishment persons guilty of violating the internal revenue laws...."[2] The regulations issued pursuant to this statute reiterate its purposive statement that rewards are to be paid for the "detection and punishment" of persons violating the internal revenue laws.[3] The regulations do not refer to the payment of a reward merely for criminal convictions or for the recovery of unpaid taxes. They provide that, in determining the amount of an award to an informant:

All relevant factors, including the value of the information furnished in relation to the facts developed by the investigation of the violation, shall be taken into account.... The amount of a reward shall represent what the district director deems to be adequate compensation in the particular case, normally not to exceed 10 percent of the additional taxes, penalties, and fines which are recovered as a result of the information.... No person is authorized under these regulations to make any offer, or promise, or otherwise to bind a district director with respect to the payment of any reward or the amount thereof.[4]

The acting chief of the criminal investigation division of the IRS had written a letter to Mrs. Tritt regarding her reward, which was introduced at trial. This letter noted that her testimony at trial was one of the factors that would be taken into account in determining her reward, and that the reward would not be paid until "the completion of the civil and criminal aspects" of the case. There is no equivalent letter to Mr. Tritt, and the Government argues that he has not received any promise of an award. On cross-examination, however, Mr. Tritt estimated his possible reward at $11,000,000, a sum the Government neither disputes nor affirms.

Considering the stated purpose of the statute and its potential for misuse as a means of obtaining favorable testimony, the Government's argument that the amount of the reward is determined solely by the taxes and penalties recovered, based

---

**2.** 26 U.S.C. § 7623 (1982).

**3.** 26 C.F.R. § 301.7623–1(a) (1988).

**4.** *Id.* § 301.7623–1(c).

on the information provided to the IRS, is misleading. The letter to Mrs. Tritt, as we have noted, indicates that her full cooperation in the criminal trial will be a factor in determining her reward, and her husband's testimony indicates a like expectation. Both Tritts, then, were "contingently motivated" witnesses.[5]

### B

Wilson's first argument is that the testimony of informants who expect to be rewarded in this fashion is barred by *Williamson v. United States*,[6] a 1962 case in which the Fifth Circuit reversed a conviction based on a transaction set up by an informer who had been hired by the Government specifically to "get" two moonshiners.

Neither the Fifth nor the Eleventh Circuit has since reversed a conviction in reliance on *Williamson*. Instead, the Fifth Circuit has subjected the rule to numerous exceptions and eventually, after the creation of this court, explicitly overruled it,[7] while the Eleventh Circuit has, at the least, limited the case to its particular facts.[8] Instead of the *per se* rule that defendants read into *Williamson*, this circuit has adopted the flexible standard announced by the Supreme Court in *Hoffa v. United States*,[9] which focuses on procedural safeguards and proportionality.

■ Due process requires four specific procedural safeguards. First, the Government must not deliberately use, or encourage the use of, perjured testimony.[10] Second, there must be a complete and timely disclosure of the fee arrangement; third, there must be adequate opportunity for cross-examination regarding the arrangement,[11] and fourth, "a defendant is entitled to a special cautionary instruction on the credibility of an accomplice or a government informer if he requests it and the testimony implicating the accused is elicited solely from the informer or accomplice."[12]

■ There is no basis for us to conclude that either Tritt committed perjury. Both Wilson and Bogus were aware that the Tritts had applied for awards under the statute, and cross-examined both at length regarding the scope of their agreements with the IRS. Wilson and Bogus nevertheless contend that portions of the Tritts' grand jury testimony, redacted by the trial court pursuant to the Jencks Act,[13] would have revealed details of the Tritt's efforts to curry favor with the IRS. The redacted materials were not, however, made part of the record on appeal,[14] and cannot now be located. We have therefore been unable independently to review the district court's determinations. Since the obligation is on the appellants to ensure that an adequate appellate record is compiled, Wilson and Bogus have effectively waived their right to contest the district court's findings on this point.[15]

■ The special-cautionary-instruction requirement was also met. In his charge to the jury, the trial judge stated:

The testimony of an alleged accomplice, and the testimony of one who provides evidence against a defendant as an informer for pay or for immunity from punishment or for personal advantage or vindication, must always be examined

---

5. *See United States v. Rey,* 811 F.2d 1453, 1454–56 (11th Cir.1987).

6. 311 F.2d 441 (5th Cir.1962).

7. *See United States v. Cervantes–Pacheco,* 826 F.2d 310, 312–15 (5th Cir.1987) (en banc).

8. *See Rey,* 811 F.2d at 1454–57.

9. 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

10. *See Hart v. United States,* 565 F.2d 360, 362 (5th Cir.1978).

11. *See United States v. Bagley,* 473 U.S. 667, 675–84, 105 S.Ct. 3375, 3380–85, 87 L.Ed.2d 481 (1985); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

12. *United States v. Beard,* 761 F.2d 1477, 1481 (11th Cir.1985).

13. *See* 18 U.S.C. § 3500(c) (1988).

14. *See* Fed.R.App.P. 10.

15. *See* Fed.R.App.P. 11(a), 10(b)(2).

and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.... [Y]ou should keep in mind that such testimony is always to be received with caution and weighed with great care.

This instruction does not mention the Tritts by name, but it was sufficiently focused to remind the jury of the special credibility issue posed by the testimony of contingently motivated witnesses.

### C.

■ Wilson and Bogus also raise a pure proportionality challenge, arguing that the enormous amounts the Tritts expected to recover *ipso facto* so compromised the trial as to violate due process. In a case involving much less money, this Circuit has recently noted that "[p]articularly when large fees are given to informers, such arrangements must be treated with suspicion." [16]

Suspicion there may well be. In most instances, however, the jury is able to employ that suspicion to determine the credibility to be given the informant, and the facts of this case do not warrant a departure from this approach. The award is provided for by statute. This is not a case in which the informant was paid to initiate criminal activity in hopes of receiving a large payoff.[17] In addition, the size of the Tritts' reward will largely be determined by the amount of tax recovered from nondefendant investors, not the conviction of Wilson or Bogus and, as the statute provides, should "normally" not exceed ten percent of the amounts recovered as a result of the information.

The statutory reward must also be put in context with other, long-accepted means by which the Government obtains favorable testimony, and which have been held not to violate due process. The prospect of a plea bargain is itself a strong inducement for a prospective co-defendant to agree to lie, yet, as the *en banc* Fifth Circuit recently noted, "[n]o practice is more ingrained in our criminal justice system." [18] The Tritts have already entered into an immunity agreement with the Government that allows them not only to avoid prosecution but also, apparently, to avoid paying taxes on their earnings from their dealings with Wilson and Bogus. The Tritts' expectation of a reward thus only highlights the issue of credibility created by the plea bargain.

The crucial question, therefore, is not whether the Tritts were inclined to testify in a way that would suit the Government, but whether the circumstances were such that the jury could not accurately weigh their credibility. We hold that, in the circumstances of this case, the size of the potential rewards that the Tritts expected to receive did not deprive the defendants of due process.

### III

■ In *McNally v. United States*,[19] the Supreme Court held that the federal mail-fraud statute [20] is restricted to efforts to deprive another of money or property, and does not protect intangible rights, such as the right to good government. Wilson and Bogus argue that their convictions must be set aside because the jury might have convicted them of defrauding the Government of intangible rights. Count One of the indictment, however, alleged a scheme "to defraud and to obtain money and other things of value from the Internal Revenue Service...." The conspiracy charges in Count One were incorporated in the subsequent counts alleging violation of the mail and wire fraud statutes, and the court's instructions to the jury repeated this language. Viewing the indictment and the

---

**16.** *United States v. Richardson,* 764 F.2d 1514, 1520 (11th Cir.1985).

**17.** *See United States v. Shearer,* 794 F.2d 1545, 1549–50 (11th Cir.1986); *United States v. Goff,* 847 F.2d 149, 160–61 (5th Cir.1988).

**18.** *United States v. Cervantes–Pacheco,* 826 F.2d 310, 315 (5th Cir.1987) (en banc).

**19.** 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

**20.** 18 U.S.C. § 1341 (1988).

jury charge as a whole, the invocation of *McNally* fails.[21]

Having reviewed the other claims raised by the defendants, and finding them to be similarly without merit, the judgment of the district court is AFFIRMED.

---

**21.** *See Lomelo v. United States,* 891 F.2d 1512  (11th Cir.1990).